## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:06-CR-60-TS |
| | ) | |
| ADABERTO GUZMAN, aka JUAQUIN | ) | |
| TAPIA, aka JOHN DOE | ) | |

### OPINION and ORDER

Before the Court is a Motion to Suppress [DE 125], filed November 21, 2007, by the Defendant, Adaberto Guzman, also known as Juaquin Tapia and John Doe.[1] The Defendant argues that he speaks, understands, and reads Spanish but not English, and that when he signed an English waiver of his *Miranda* rights, he did not do so knowingly and intelligently. Accordingly, he seeks to suppress the incriminating statements that he made to authorities after signing that waiver.

The Government filed a Response [DE 135] on December 11, 2007. An evidentiary hearing was held January 11, 2008. The Defendant filed his Brief in Support of Motion to Suppress [DE 175] on May 19. The Government filed its brief in opposition [DE 181] on June 19, and the Defendant replied [DE 182] on July 7, 2008. The government filed a Sur-Reply [DE 184] on July 9. The Defendant filed a Motion to Strike [DE 185] that sur-reply on July 11, but the Court denied [DE 186] the motion and ordered that the Defendant had until July 26 to respond to the sur-reply. The Defendant filed a Sur-Sur-Reply [DE 189] on July 29.

---

[1] The relevance of these aliases will be explained later in this Opinion. *See* Part D.1., *infra*.

**BACKGROUND**

This motion and criminal case arise from an investigation of a shipment of about 1000 pounds of marijuana from Brownsville, Texas, to Fort Wayne, Indiana. Agents from Immigration and Customs Enforcement (ICE), a federal agency, and local Indiana law enforcement were involved in the investigation.

After the drugs arrived in Fort Wayne, agents and police made several arrests on October 18, 2006. For context and background purposes, the Defendants and the roles they played, as alleged by the government, are provided here. Defendant Guzman is alleged to have hired a person to drive the drugs from Texas to Fort Wayne. (Lievers Affid. 1–2, DE 1-2 at 2–3.) Defendant Guzman and Defendant Andres Cuellar (also known as Andres Cuellar-Chavez) gave instructions to the driver, including an order to contact Defendant Jose Hernandez when the driver arrived in Fort Wayne. (*Id.* at 1–2.)

When the drugs arrived, Defendant Hernandez met the driver, and they drove to a home owned by Defendant Jose Ramirez where they unloaded the marijuana. (*Id.* at 2–3.) Defendant Hernandez and the driver left the house and met Defendants Guzman, Cuellar, and Enedeo Rodriguez at a Fort Wayne restaurant. (*Id.* at 3.) Later that evening, Defendants Hernandez and Ramirez were arrested at the house where the marijuana was stored, and the drugs were seized. Police also arrested the other three Defendants at the restaurant that evening. (*Id.* at 4.)

The Defendants were transported to an Indiana State Police post in the southwest area of Fort Wayne for processing and interrogation. The interactions between the Defendant and law enforcement—ICE Steve Stow, Agents Arturo Cantu, and Joshua Lievers—at that point form the basis of the motion and dispute now before the Court.

2

The Defendant claims that his waiver of *Miranda* rights was not done knowingly and intelligently, requiring the suppression of the incriminating statement he made. Specifically, the Defendant claims that he speaks, reads, and understands only Spanish and not English, that the agents did not explain his rights to him during the interview, that the interview was conducted in English, and that as a result he did not appreciate the significance of signing the waiver form, which he was tricked into doing under the pretense of getting an appointed attorney. (Govt. Ex. 3-2.) The government argues that the Defendant does speak, read, and understand English, that Agent Cantu explained to the Defendant his rights, that the interview was conducted in English, and that the Defendant understood what he was doing when he signed the waiver of rights form.

What the two sides do agree on is that the dispute in this case essentially comes down to credibility: the credibility of the Defendant versus the credibility of the two agents who interviewed him. (*See* Def. Br. in Supp. of Mot. to Suppress 7, DE 175; Govt. Br. in Opp. to Def. Mot. to Suppress 9, DE 181.)

An evidentiary hearing for this motion was held on January 30, 2008. A Spanish-English interpreter was present in the courtroom and translated for Defendant Guzman during the hearing. Also, an evidentiary hearing for Defendant Rodriguez's Motion to Suppress [DE 103] was held on October 18, 2007. Defendant Guzman and his attorney were present at that hearing. Relevant information from that hearing—such as Defendant Guzman's brief testimony and the cross-examination of two agents by Defendant Guzman's counsel—will be used in this Opinion.

Defendant Guzman was operating under the alias of Juaquin Tapia when he was taken into custody and during his interview. Even though this Court refers to him in this Opinion as Guzman, he is referred to as Tapia in documents and often during the hearings.

## LEGAL STANDARD

Before police can conduct a custodial interrogation of a suspect, they must advise him of certain rights and abide by certain procedures. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The rights a suspect must be informed of include the right to remain silent, the right to have an attorney present, and the right to have an attorney who is retained or appointed. *Id.* However, a defendant may waive his *Miranda* rights if "the waiver is made voluntarily, knowingly[,] and intelligently." *Id.*

That "inquiry has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Regarding this second aspect, the waiver must be "a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *see also United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001).

Then "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421 (internal quotations omitted).

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* 422–23. The government has the burden of showing that the waiver was valid by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

**FINDINGS OF FACT**

The evidence presented at the October 18, 2007, and January 30, 2008, evidentiary hearings shows the following to be the relevant credible facts proven by a preponderance of the evidence. *Connelly*, 479 U.S. at 168.

**A.      Defendant Guzman's General Testimony About His Background**

Defendant Guzman testified that he is fifty-four years old, he was born in Matamoros, Mexico, and lived all his life in Mexico except for about the past six years when he lived in Brownsville, Texas. (Jan. Hr'g Tr. 47:16–48:3, 48:19–23.) Regarding his educational background, Defendant Guzman testified he received a license or degree in "administration of companies." (*Id.* at 49:2–4.) The Defendant testified that he never studied English in school, never spoke the language as a child, and did not speak the language when he moved to Brownsville, where he lived in a Spanish-speaking community. (*Id.* at 49:6–15, 21–23.) His nine children all speak Spanish when he is with them. (*Id.* at 49:12–50:4.) Since his incarceration in October 2006, the Defendant said he has learned a few English phrases and words from others. (*Id.* at 52:4–9.)

**B.     Encounter with Agent Steve Stow**

The Defendant's first encounter with law enforcement that is at issue for this motion is his interaction with Agent Stow during processing at the Indiana State Police post on the evening of October 18, 2007. At the time, Agent Stow was the group supervisor for the ICE office in Brownsville, Texas, and he supervised the agents involved in this case. Agent Stow speaks very little Spanish. (*Id.* at 16:13–15.)

**1.     *Agent Stow's Version of the Encounter***

Agent Stow testified that during fingerprinting he conversed with Defendant Guzman in English. (*Id.* at 12:5). Agent Stow told Defendant Guzman and others that it would be best for them if they cooperate. (*Id.* at 12:8–15, 13:6–9.) Agent Stow could tell that Defendant Guzman understood what he was saying, (*id.* at 13:6–9, 13– 16), because Defendant Guzman said the word "yes" at least once, (*id.* at 18:12–13), and Defendant Guzman did not speak in Spanish or otherwise express that he did not understand, (*id.* at 13:17–19.)

Later, Agent Stow communicated with Defendant Guzman when Agent Stow filled out a personal history report on a standardized form known as DEA 202. (Govt. Ex. 1.) Agent Stow testified that he would not have been able to write down the social security number (ending in 9362) or the location of the Defendant's parents (Jalisco, Mexico) without conversing with the Defendant. (Jan. Hr'g Tr. at 14:2–5, 8–9, 12–21.) The Government introduced into evidence the contents of Defendant Guzman's wallet. This included a driver's license with a Brownsville, Texas, address, a Bank of America credit card, an Ace Cash Express Visa debit card, a Western Union card, a Moneygram Moneysaver card, and a birth certificate from Cameron County,

Texas. (Govt. Ex. 2.) All of these documents used the name Juaquin Tapia, not Adaberto Guzman. None of these documents referred to Jalisco, Mexico, or listed the social security number that was on the personal history report. The Defendant stated that the social security number was in the documents recovered from Defendant Guzman's wallet, (Def. Br. in Supp. of Mot. to Suppress 2 n.1, DE 175), but the Court's review of the exhibits indicates otherwise, and the Defendant did not specifically mention which item contained the social security number.

**2.**      *Defendant Guzman's Version of Encounter with Agent Stow*

Defendant Guzman testified that he did not remember communicating with or seeing Agent Stow on the night he was arrested. (Jan. Hr'g Tr. 53:1–13.)  He said that the personal history form was not filled out in his presence and that he was not asked about the whereabouts of his parents or their names (except by the probation officer long after the arrest). (*Id.* at 53:22–55:3.)

**C.**      **Interview with ICE Agents Cantu and Lievers**

The exchange between the Defendant and these two agents is the central issue in this dispute. The Defendant and the agents present two opposing accounts of the interview and the reading of the waiver of rights form: the Defendant claims they spoke Spanish, and the agents claim they spoke English; the Defendant claims his rights were not explained to him and he was tricked into signing the form, and the agents claim his rights and the significance of the waiver were explained and he understood them when he signed the form.

Defendant Guzman was the second Defendant interviewed that evening. First was Hernandez, third was Rodriguez, fourth was Ramirez, and fifth and last was Cuellar. The agents interviewed each Defendant alone, that is, separate from the other Defendants. (*Id.* at 38:1–4.) The waiver of rights form was in Spanish for Hernandez, Ramirez, and Cueller and in English for Guzman and Rodriguez. (Govt. Br. in Opp. to Def. Mot. to Suppress 2, DE 181.)

Agents Cantu and Lievers were the only two law enforcement officials to interview Defendant Guzman. (Jan. Hr'g Tr. 24:24–25:2.) Agent Cantu speaks fluent Spanish, (Oct. Hr'g Tr. 7:21–24), while Agent Lievers knows only a few words of Spanish (*Id.* at 36:20–22). Agent Cantu was the lead interviewing agent while Agent Lievers took notes of the exchange. (Govt. Ex. 5.) Agent Cantu also took his own notes. (Govt. Ex. 4.) The interview was not electronically recorded.[2] (Jan. Hr'g Tr. 31:19–22.)

**1.      *The Waiver of Rights Form***

At the top of the form is a logo for the Department of Homeland Security and the words "U.S. Immigration and Customs Enforcement." The top section of the form is the statement of rights. It lists the basic *Miranda* rights and warnings: the right to remain silent; a warning that any statement made can be used against the person in court or in other proceedings; the right to consult an attorney before making a statement or answering questions; the right to have an attorney present during questioning; the right to have an appointed attorney before questioning if the person cannot afford one; and the right to stop questioning at any time or to consult an attorney even if the person decides to answer questions at that time. (Govt. Ex. 3-2.)

---

[2] *Miranda* does not require that interviews or interrogations be electronically recorded. *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004).

The bottom section of the form is the waiver. It states: "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity." (Govt. Ex. 3-2.) It then has text with blanks for when the person was taken into custody and when the person signed the document. It then has a line for the person's printed name and a line for the person's signature. Below that there is a line for the signature of two witnesses and the dates they signed the form.

On this form, Agent Cantu filled out the following parts of the waiver section of the form: the times and dates when the Defendant was taken into custody and when he signed the form, and the line where the signer's name is printed. (Jan. Hr'g Tr. 29:12–30:2.) Agent Cantu also wrote an "X" next to the signature line where Defendant Guzman signed his name (as Juaquin Tapia). (*Id.* at 30:18–19.) Agent Cantu signed the first witness line and Agent Lievers signed the second witness line. (*Id.* at 30:2–7.)

**2.      *The Agents' Version of the Interview of Defendant Guzman***

Agent Cantu testified that he asked Defendant Guzman if Defendant Guzman wanted to be interviewed in English or Spanish, that he indicated to Defendant Guzman that they could use waiver forms in either language, and that Defendant Guzman answered that he spoke English. As a result, Agent Cantu began reading the waiver in English. (*Id.* at 25:10–15, 26:3–5, 29:1–11.) Agent Lievers testified that Agent Cantu's original question to Defendant Guzman about what language he preferred was in Spanish. (*Id.* at 38:4–5.) Defendant Guzman replied in English that "I speak English," (*id.* at 38:5–6), and after that the conversation was in English. (*Id.* at 38:6–9.)

Agent Cantu testified that he followed his typical practice of reading each statement, or sentence, within the "Rights" section of the form and then asking the defendant if he understands that particular statement.[3] (*Id.* at 26:8–17, 30:20–31:9.) Agent Cantu testified that Defendant Guzman responded each time by saying "Yes, I understand." (*Id.* at 31:13–18.) Agent Cantu said that Defendant Guzman had no trouble understanding him, did not ask that Agent Cantu repeat anything in Spanish, and had no trouble signing the form in the appropriate place. (*Id.* at 26:20–27:4.) Agent Cantu indicated that he printed the Defendant's name (as Tapia) on the form (rather than having the Defendant do so) because that is his practice: "I print the client's name on the form, and then I asked the client to sign, if he's willing to talk to us." (*Id.* at 29: 18–19.)

Agent Lievers confirmed Agent Cantu's account of reading each sentence or statement within the "Rights" section of the form, and he added that Agent Cantu placed a copy of the waiver of rights form in front of Defendant Guzman for the Defendant to read along with Agent Cantu. (*Id.* at 38:15–20.)

Agent Cantu testified that Defendant Guzman was responsive to the questions during the interview. (*Id.* at 33:2–15.) Agent Cantu's notes indicate Guzman was forthcoming about his own role and the role of the other Defendants in the shipment of drugs. (Govt. Ex. 4 at 1.) The notes reflect that Defendant Guzman said his job was to find a driver for the marijuana and that he was going to get $7500 for his part in the deal. (*Id.*) He also stated that "EJ purchased my flight via Southwest" and that he stayed at "EJ's house." (*Id.*) "EJ" is a reference to Defendant Rodriguez. (*See* Lievers Affid. 5; DE 1-2 at 6.)

---

[3] Agent Cantu and Agent Lievers gave the same testimony at the October 2007 hearing, namely, that Agent Cantu's typical practice is to read each statement within the "Rights" section to a defendant and then to ask if the defendant understands that right, and that he did so in this case. (Oct. Hr'g Tr. 15:9–11, 27:6–18, 38:9–11, 85:17–19, 20–22.)

Agent Lievers did not ask any questions during the interview, (Jan. Hr'g Tr. 40:6–11), which he said was conducted in English (*id.* at 37:10–16). He took notes of Defendant Guzman's answers and said he would not have been able to do so if the conversation was in Spanish. (*Id.* at 39:2–7, 40:25:–41:3.) While the agents' notes are not the exact same, they both recorded several of the same material facts: Defendant Guzman's job was to find a driver to bring the marijuana from Texas to Fort Wayne; Defendant Cuellar asked Defendant Guzman to do so; Defendant Guzman was to be paid $7500 for his role; Defendant Rodriguez paid for Defendant Guzman's flight on Southwest from Texas to Indiana; and the driver was paid $15,000. (*See* Govt. Ex. 4; Govt. Ex. 5).

Agent Lievers said his notes are not a verbatim recitation of what was said during the interview, (Jan. Hr'g Tr. 43:20–23), but instead agents "try to summarize [the comments] to reflect that statement that was provided by that individual." (*Id.* at 40:4–5.) During cross-examination, Agent Lievers was asked why, if the Defendant did not refer to himself in the third person, Agent Lievers wrote his notes in the third person from the perspective of Defendant Guzman. That is, Agent Lievers was asked why he referred to the Defendant by name as "Tapia" instead of "me" or "I." Agent Lievers testified "That's how I write. . . . That's the way I wrote this one that is presented here . . . ." (*Id.* at 42:18–21.)

Finally, both agents specifically denied Defendant Guzman's account that Agent Cantu and the Defendant spoke in Spanish and that Agent Cantu translated the answers into English for Agent Lievers. (*Id.* at 44:5–9, 67:23–68:2.) Also, Agents Cantu and Lievers gave the same testimony at the October 2007 evidentiary hearing, namely that the interview with Defendant

11

Guzman was in English after the Defendant was given the choice between Spanish and English. (Oct. Hr'g 30:7–11, 51:1–4, 51:11–52:6, 52:22–53:15.)

**3.    *Defendant Guzman's Account of the Interview with the Agents***

While Defendant Guzman denied ever communicating with Agent Stow, he testified that he did recall the interview with Agents Cantu and Lievers. (Jan. Hr'g Tr. 55:17–25.) Defendant Guzman said that he and Agent Cantu spoke in Spanish, that Agent Lievers never spoke to him, and that Agent Cantu spoke to Agent Lievers in English, translating the Spanish conversation for Agent Lievers. (*Id.* at 56:2–21.)

Defendant Guzman testified that his signature is on the waiver section of the rights form but that he does not read English. (*Id.* at 56:23–57:3.) His explanation for signing it is that Agent Cantu told him he must sign the document in order to have an attorney appointed. (*Id.* at 57:7–13.) Defendant Guzman denied that Agent Cantu explained the specific rights at the top of the form. (*Id.* at 57:15–58:4.) Defendant Guzman, who testified briefly at the October suppression hearing, was consistent between the two hearings in his account that Agent Cantu spoke to him entirely in Spanish during the interview, (Oct. Hr'g Tr. 97:11–17), and in denying that they spoke English (*Id.* at 99:20–22).

**D.    Court's Credibility Findings**

**1.    *Defendant Guzman's Credibility***

The Court begins with Defendant Guzman's credibility. During cross-examination, Defendant Guzman admitted lying about his identity, specifically being Juaquin Tapia, in the

following ways: lying to the Texas Department of Public Safety to obtain and renew a driver's license under the Tapia name (Jan. Hr'g Tr. 59:25–60:13); lying to Bank of America in order to obtain a debit card (*id.* at 63:5–15); lying to the probation officer about his names and the names of his parents (*id.* at 64:24–65:3); and lying to Magistrate Judge Cosbey about his name during the initial appearance (*id.* at 66:5–16; *see also* Initial Appearance Tr. 6, Oct. 24, 2006, ("THE COURT: Mr. Tapia, would you state your true name. DEFENDANT TAPIA: Juaquin Tapia.")). Defendant Guzman also lied during his testimony when he denied lying about his name to the magistrate judge during that initial appearance. Defendant Guzman testified that "I said to him I was Juaquin Tapia and Adaberto Guzman. And he asked, 'What is your true name?' And I said it was Adaberto Guzman." (Jan. Hr'g Tr. 66:13–15.) The transcript of the initial appearance shows that the Defendant only provided his false name of Tapia and did not state that his name was Adaberto Guzman. (Initial Appearance Tr. 6.) Agent Lievers attended Defendant Guzman's initial appearance with the magistrate judge in this case. At that time, Agent Lievers testified that he heard Defendant Guzman say that his name was Juaquin Tapia. (Jan. Hr'g Tr. 35:20–36:1.) A review of the Defendant's detention hearing on October 26, 2006, reveals that the Defendant told the magistrate judge that his name was Juaquin Tapia and did not state that his name was Adaberto Guzman. At the Defendant's post-indictment initial appearance, detention review, and arraignment on November 16, 2006, he finally used his real name, Adaberto Guzman. (Arraignment Hr'g Tr. 6, Nov. 15, 2006 ("THE COURT: Very well. Thank you. We'll now direct our questions to Mr. Tapia. Mr. Tapia, would you state your true name please. DEFENDANT TAPIA: Adaberto Guzman.")).

Defendant Guzman during his direct testimony admitted that he lied during his interview with the probation officer. He testified that he told the probation officer that his parents lived in Jalisco, Mexico, and then testified that actually his father is deceased and his mother lives in Reynosa, Tamaulipas in Mexico. (Jan. Hr'g Tr. 54:25–55:11.) Defendant Guzman also admitted that the birth certificate he carried in his wallet with the Tapia name does not belong to him. (*Id.* at 64:8–11.) "That birth certificate — that certificate is not mine. And the names that appear there, they're not mine. Those are not my parents." (*Id.* at 64:15–18.)

The Defendant elaborated on some of this conduct. For example, regarding the lie to Bank of America about his identity, he testified that the reason for giving the Tapia name was so that he "could just leave [sic], subsist in this country," (*id.* at 65:13–14), and he added that "[w]ell, at that moment, I was Juaquin Tapia." (*Id.* at 63:8–9.) Defendant Guzman was not Juaquin Tapia at that moment; he was Adaberto Guzman masquerading as Tapia.

Finally, the Court's own observation of the Defendant during the hearing, and specifically when he took the witness stand, also supports a finding that his claim that he does not speak, read, and understand English is false.[4]

---

[4] Specifically, when Defendant Guzman sat down in the witness chair, the Court asked him to attach the microphone (on a wire) to the lapel of his clothes. This request is reflected in the record. (Jan. Hr'g Tr. 46:5–6.) The Court makes this request or gives this instruction to witnesses when they take the stand. The crucial observation is that after the Court made this statement, Defendant Guzman made eye contact with the Court, reached out (apparently instinctively), picked up the microphone, and attached it to the lapel of his clothing. This occurred before the interpreter had a chance to interpret the Court's request. It appeared that Defendant Guzman understood the Court's request in English. The Court believes that while Defendant Guzman was prepared to wait for questions in English from counsel to be translated, he was not expecting any instruction or request from the Court. Caught off guard, he instinctively complied with the request to pick up the microphone before it occurred to him that he should act like he did not understand the Court's request. Of course, this observation is not necessarily dispositive for the Court's finding that Defendant Guzman understands English, but it certainly supports it strongly.

2.      *Credibility of Agents Cantu, Lievers, and Stow*

The Court now turns to the credibility of Agents Cantu, Lievers, and Snow. The agents were forthright and straightforward, rather than evasive or circumspect, during their testimony. Each agent's testimony was internally consistent; that is, each agent's testimony at the January hearing was consistent and not contradictory. It is the case that, at one point, Agent Cantu said some of the interview was conducted in Spanish. (Jan. Hr'g Tr. 27:8–10.) However, a few moments later, he testified that "we did the whole interview in English." (Id. at 28:5–9.) The Court interprets the earlier statement to refer to Agent Cantu's initial question to the Defendant about what language the Defendant preferred to use. This question, as Agent Lievers testified, was in Spanish. (*Id.* at 38:4–5.)

Also, each agent's individual testimony was plausible and reasonable. None of their accounts seemed unusual or improbable. (The Court in Part 3, *infra*, addresses some of the Defendant's specific challenges to the agents' testimony and the inferences that can be made from the testimony.) Also, the testimony of each agent is consistent with the other agent's testimony. For example, Agent Lievers corroborated Agent Cantu's testimony that Agent Cantu read each statement, or sentence, within the "Rights" section of the form and then asked the Defendant if he understood that specific sentence. The Court finds no significance in the fact that their notes contain slight differences because, first, both sets of notes contain the same key facts about the Defendant, his role, and the role of others; second, the Court finds no contradictions between the notes; and third, Agent Lievers' explanation of the differences makes sense. He testified that the agents' notes may differ in some respects because "some notes may be more

15

pertinent to one agent or maybe jog a memory or something to come back to reflect to than another agent. That's why they might have different notes." (Jan. Hr'g Tr. 40:22–24.)

Further, the testimony of Agents Cantu and Lievers during the January hearing was consistent with their testimony during the October hearing.[5] Finally, the Court is finding in a separate Opinion regarding Defendant Rodriguez's suppression motion that their testimony during that October hearing was credible, consistent, plausible, and reasonable.

Agent Stow's testimony is less critical to determining what happened during the main interview, but the Court finds his testimony to be consistent, reasonable, and plausible. Agent Stow, like the other two agents, was forthright and straightforward during his testimony. His account of how he obtained the information for the personal history form is supported by the evidence.

**3.      *Defendant's Arguments***

The Court now addresses a number of the Defendant's arguments in support of the Defendant's claims:

> (1) Agent Stow's account of what happened can be consistent with the claim that the Defendant does not speak or understand English because the Defendant was just nodding his head and saying the word "yes" in the way a person who only understands English might nod his head to a Mexican police officer and say the word "Si." (Def. Br. in Supp. of Mot. to Dismiss 8.)
> (2) The fact that Defendant Guzman signed at the "X" on the form does not mean he understood the English form. People understand that an "X" on a form means "sign here" even if they don't understand the language on the form. (*Id.*)
> (3) The fact that Agent Cantu printed the Defendant's name (as Tapia) indicates that Defendant Guzman could not read and understand the "print name" instruction, so Agent

---

[5] For example, both agents testified at the October hearing that Agent Cantu's typical practice is to read each sentence of the "Rights" form and then ask the defendant if he understands, and that he did so in this case. (Oct. Hr'g Tr. 15:6–14, 27:6–18, 28:9–11, 85:20–22.)

16

Cantu had to print the Defendant's name for him. In other words, if Defendant Guzman understood and could read English, there was no reason for Agent Cantu to print the Defendant's name on that line. (*Id.* at 9.)

(4) Agent Lievers said he was trying to copy exactly what was said during the interview, and he wrote about the Defendant by name in the third person. That means it is more likely that Agent Cantu was translating the conversation from Spanish to English. If the conversation was in English, the Defendant would have been in the first person in the notes, as "me" or "I." Similarly, the fact that Agent Cantu's notes refer to the Defendant in the first person (e.g., "my job," "Cuellar asked me") indicates Agent Cantu and the Defendant spoke in Spanish with Agent Cantu translating into English for Agent Lievers. (*Id.*)

(5) Agent Stow testified that he "could have solicited [the social security number and his parents' names and location] from him directly," (Def. Reply Br. 3 (quoting Jan. Hr'g Tr. 15:8–9)), so that leaves open the possibility that Agent Stow got this information from a third party and not the Defendant.

As to the first argument, Agent Stow's account, in complete isolation from all other facts in this case, could theoretically be interpreted as consistent with the claim that Defendant Guzman does not understand English and was simply nodding his head and saying the simple English word "yes" in response to an authority figure's statement. However, his account is not the sole or even primary basis of the government's argument. There is a wealth of facts that supports a finding that Defendant Guzman understood English when he spoke with the ICE agents. Another problem with this argument is that the Defendant claims this encounter never took place. Either Agent Stow and Defendant Guzman conversed or they did not. If the Court believes the Defendant, that's the end of the matter as far as Agent Stow's account goes. But if the Court believes Agent Stow's claim that there was an encounter, then the Court has to disbelieve the Defendant's claim that there was no such encounter. Since the Court believes this encounter occurred, it believes Agent Stow's account and credits his testimony that Defendant Guzman indicated he understood what Agent Stow was saying.

The Defendant's second argument is reasonable and plausible, but so is an alternative view of the import of the "X" on the signature line: Agent Cantu simply marked where Defendant Guzman agreed to sign to show it to him. When a person is filling out a preprinted form, it is natural for the other person providing the document (and more familiar with it) to put an "X" on the line(s) where the signer is to sign. In other words, the presence of "X" next to a signature line does not indicate or imply that the signer did not understand the language of the form and required the "X" in order to know where to sign. And, in this case, it certainly does not cast doubt on all the other facts and testimony indicating that Defendant Guzman did and does understand, speak, and read English.

The third argument rests on the same theory as the second and fails for the same reasons. The Defendant's claim could explain why Agent Cantu printed the Defendant's name, but it could also be the case that Agent Cantu printed the name simply because he was already filling in other parts of the form (the times and dates of arrest and signing) or because, as he indicated during cross-examination, that is his practice. That explanation is plausible and reasonable. With multiple Defendants and multiple forms, it makes sense for an agent to write a particular Defendant's name on a particular form before the Defendant agrees to sign it. In light of all the other facts in this case, the Court is not persuaded that this fact supports the claim that the Defendant did not understand English, the form, or the form's import when he signed the waiver.

The fourth argument has at least two problems. First, Agent Lievers clarified that he was not taking verbatim notes but instead trying to accurately reflect or summarize what the Defendant was saying. Second, it was reasonable for Agent Lievers, who was trying to sort out the role of at least five persons in an interstate marijuana operation, to list each person by name,

including the person being interviewed. The Defendant's argument—that the Defendant being listed in the third person, by name, rather than as "I" or "me," indicates Agent Cantu was translating for Agent Lievers—is no more plausible than the Agent Liever's explanation for why his notes were the way they were.

The fifth argument tries to make much out of an isolated sentence of Agent Stow's testimony about where he did get or could have gotten a social security number and the names and location of the Defendant's parents. The entire context of Agent Stow's testimony makes clear that he believes that he obtained the social security number, parents' names, and parents' location from Defendant Guzman and not from any documents or other sources. It is the case that Agent Stow "never said with absolute certainty," (Def. Reply Br. 3), that the information came from Defendant Guzman, but he did say he was "almost confident," "I know," "probably," and "I believe." (14:25–15:5, 15:12–17.) Also, the social security number and the location Jalisco, Mexico, do not appear in any of items recovered from Defendant Guzman's wallet. (Govt. Ex. 2.)

In addition, the Defendant's alternate explanation for where the information came from—"the Pretrial Services Report as well as other sources that may have been available to him," (Def. Reply Br. 3)—does not fly. There is no indication that an officer from probation and pretrial services was present at the state police post on October 18, 2006, and it would be very unusual if an officer was present during the initial stage of custody, booking and questioning. Even if a pretrial and probation officer was present, there is no explanation for how the officer would know information that the agents could not find in the items they recovered from the Defendant's wallet. Also, as the government notes, agents generally do not have access to

pretrial reports, and Agent Stow was not present at any of the post-arrest Court proceedings.

(Govt. Sur-Reply 2–3; DE 184.) The Defendant in his Reply and Sur-Sur-Reply has not specified

what the "other sources" for the information could be. The weight of believable testimony and

evidence supports a finding that Agent Stow obtained the information from Defendant Guzman

during a conversation.[6]


**4.**     *Court's Findings*

To summarize, there is quite a credibility gap between the Defendant and the agents. The

Defendant has admitted lying about his identity in the past in general (Texas government, Bank

of America) as well as in relation to this case (probation officer, magistrate judge). Given

Defendant Guzman's documented history of lying, the Defendant's credibility is sorely lacking.

In light of this pattern of falsehood, anything the Defendant says that is contradicted by the

sworn testimony of other witnesses is highly suspect. The Defendant tries to brush all this aside

by stating that the "question is, who is telling the truth, not what is Tapia's real and true

identity." (Def. Reply Br. 4.) That seriously downplays the significance of Defendant Guzman's

efforts to hide his true identity and to pretend to be Tapia. The Defendant's identity is relevant to

who is telling the truth because the Defendant has not been telling the truth about his identity.

When the Defendant's credibility is compared to the credibility of the three agents who

testified, there is no question whose account should be believed. There is nothing in the record to

---

[6] In any event, this particular point regarding where Agent Stow obtained the information about the Defendant's social security number and parents is not dispositive for the ultimate finding that the Defendant understands, reads, and speaks English, that he spoke to the agents in English, and that his waiver of rights was done knowingly and intelligently.

indicate that the agents have lied in general or in reference to this case. Rather, their testimony has all the hallmarks of being truthful: the agents were forthright and straightforward during the hearing; each agent's individual testimony was internally consistent and consistent with prior testimony; the testimony of each agent was consistent with the testimony of the other agents; and all their testimony was plausible and reasonable.

Also, taking into account how the agents treated the three other Spanish-speaking Defendants, the agents' account of Defendant Guzman's interview makes sense, and the Defendant's claims seem implausible. For Defendants Hernandez, Ramirez, and Cueller, the agents used a Spanish waiver of rights forms, (Oct. Hr'g Tr. 11:24–13:7), and Agent Cantu interviewed them in Spanish. (*Id.* at  51:1–4, 51:11–52:6). The Defendant has not disputed this. This respect for those Defendants' *Miranda* rights does not square with Defendant Guzman's account of duplicitous agents who snookered him into signing away his rights and discussing his role in the marijuana operation. It seems implausible that, on the one hand, the agents would respect those other Defendants' rights while, on the other hand (according to Defendant Guzman's claims) Agent Cantu would interview Defendant Guzman in Spanish and trick him into signing the waiver of rights form, and that both agents would then lie about this.

In conclusion, the Court finds that Defendant Guzman and his account of what happened lack credibility. The Court also finds that Agents Cantu, Lievers, and Stow and their accounts of what happened are credible. Accordingly, the Court credits the agents' testimony that: Agent Cantu asked Defendant Guzman whether he wanted to proceed in English or Spanish; Defendant Guzman chose English; Agent Cantu read the English waiver of rights form, explaining each sentence or statement to the Defendant; Defendant Guzman indicated in English and/or by action

that he understood these rights; Defendant Guzman and Agent Cantu spoke in English and not in

Spanish during the interview; Agent Cantu did not speak in Spanish with Defendant Guzman and

did not translate Spanish into English for Agent Lievers; Agent Stow conversed with Defendant

Guzman in English; Defendant Guzman indicated in English and/or by action that he understood

Agent Stow; and Defendant Guzman answered Agent Stow's questions with information that

appeared on the personal history form that did not come from the contents of the Defendant's

wallet.

The Court also discredits Defendant Guzman's testimony that: he and Agent Cantu spoke

in Spanish the entire time; Agent Cantu told the Defendant he needed to sign the English waiver

of rights form to get an appointed lawyer; Agent Cantu did not explain each of the rights listed

on the form; Agent Cantu translated the Spanish conversation into English for Agent Lievers;

Agent Stow never communicated with Defendant Guzman; and Defendant Guzman never

provided information to Agent Stow for the personal history report.


## LEGAL CONCLUSION

The Defendant concedes that voluntariness is not at issue because he does not allege that

there was intimidation and coercion involved in his waiver of *Miranda* rights. (Def. Br. in Supp.

of Mot. to Suppress 6). Rather, the issue is whether Defendant Guzman knowingly and

intelligently waived his rights, that is, whether he understood what he was doing when he signed

the waiver. The Defendant makes several arguments for this point.

First, he argues that Agent Cantu spoke entirely in Spanish, used an English waiver of

rights form, and tricked the Defendant into signing the form by claiming it was necessary to get

an appointed attorney.[7] This argument works only if the Court disbelieves not just one claim by

the agents (that the interview was in English) but also almost all of their other claims and

testimony (especially that Agent Cantu explained each specific right and Defendant Guzman

indicated that he understood those rights before he signed). As explained earlier in the Findings

of Fact section of this Opinion, the Court does not believe any of these claims by Defendant

Guzman because of his documented lack of credibility. Instead, the Court believes the agents'

account of the interview. Therefore, this first argument fails.

> The Defendant also makes an alternative argument.

> Even if Tapia does understand some English, it seems highly doubtful that he
> understands enough English to have any appreciation of what the consequences of
> relinquishing his *Miranda* rights are. In this sense, it doesn't matter . . . if Cantu is correct
> and the conversation remained in English. The fact is, Tapia's background is such that he
> did not have a full awareness of the nature of the right which he was abandoning and the
> consequences of abandoning that right. . . . Tapia, simply didn't understand what he was
> doing.

(Def. Br. in Supp. of Mot. to Suppress 8.) The Defendant added that the failure of the

government to produce either recordings of the Defendant speaking in English or additional

witnesses means the government has not met its burden to establish that the waiver was executed

knowingly and intelligently. (Def. Reply Br. 6.) This argument suffers the same critical flaw that

all the rest do: it depends on the Court believing and crediting the testimony of the Defendant. It

is true that the Defendant's testimony about his background and education was not contradicted.

But the purpose of that testimony was to support the Defendant's ultimate claim that he does not

---

[7] The Defendant's passing reference to deception (but not coercion or intimidation), (Def. Br. in Supp. of Mot. to Suppress 6), playing a role in the waiver appears to be based on the Defendant's claim that Agent Cantu tricked him into signing the waiver form by lying that it was necessary to obtain an appointed attorney. This deception argument, like the Defendant's other arguments, depends on the Court believing the Defendant's account of the interview and disbelieving the two agents' accounts of the interview. Accordingly, this argument fails.

speak, read, or understand English. The testimony of the three agents satisfies the Court that Defendant Guzman did understand English sufficiently enough to comprehend his rights and what it meant to waive them despite the Defendant's testimony that he never studied English, lived most of his life in Mexico, and lived in a Spanish-speaking community in Texas. Given what the agents described about Defendant Guzman's conversations with them, the Court concludes that the Defendant's waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

There is no other information in the record to cast doubt on a conclusion that the Defendant knowingly and intelligently waived his rights. The Defendant's educational background—it appears to be some kind of post-high school license or administration study—is sufficient for him to have understood the meaning and import of the *Miranda* rights that were read to him. *United States v. Spruill*, 296 F.3d 580, 589 (7th Cir. 2002) (thirty-four-year-old suspect with ninth-grade education and a high school equivalency certificate knowingly waived his *Miranda* rights); *Stawicki v. Israel*, 778 F.2d 380, 382–84 (7th Cir. 1985) (twenty-three-year-old suspect with high school equivalency certificate and average intelligence knowingly and intelligently waived his *Miranda* rights).

The government need not produce a smoking gun, such as a recording of the Defendant speaking English, to meet its burden; such a standard is more akin to clear and convincing evidence rather than a preponderance of the evidence, which is the standard here. The Court notes that the Defendant's behavior during the hearing indicated (apparently involuntarily) that he understood the Court's request in English. Whether that slip constitutes a smoking gun need

24

not be decided. Also, three witnesses (whose testimony is consistent and reasonable) is plenty for the determination that must be made here; the government need not produce a jail house snitch or some other witness to testify that the Defendant speaks English.

The Defendant's final argument is that the Defendant's "very full and thorough confession leads to the conclusion that he never understood his Miranda [r]ights and never understood the consequences of waiving them." (Def. Br. in Supp. of Mot. to Dismiss 9.) Surely a defendant's confession to authorities cannot be deemed evidence that the defendant did not know what he was doing. Otherwise, as other courts have pointed out, what is one to make of the countless cases in the law books where defendants made full confessions knowingly and intelligently? There may be good reason for the Defendant's confession; after all, confession is good for the soul. But the Defendant's motive for confessing need not concern the Court because the issue is whether the waiver was executed knowingly and intelligently. The Court concludes that it was.

**CONCLUSION**

For the foregoing reasons, Defendant Guzman's Motion to Suppress [DE 125] is DENIED.

So ORDERED on August 6, 2008.

  s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT